**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No.: 13-cv-00158-RM-MJW

PATRICK HARTLEY,

      Plaintiff,

v.

TIME WARNER NY CABLE LLC,

      Defendant.

---

**DECLARATION OF NATHAN D. CHAPMAN IN SUPPORT OF
DEFENDANT'S MOTION FOR CONTEMPT**

---

I, Nathan D. Chapman, hereby declare and state as follows:

1.      My name is Nathan D. Chapman, I am over the age of 18 and competent to give this Declaration.

2.      I am counsel of record for Defendant Time Warner NY Cable LLC ("Defendant" or "TNY") in the above-captioned matter.

3.      This Declaration is made based on my personal knowledge and a review of my files.

4.      On September 3, 2013, I took Plaintiff Patrick Hartley's ("Plaintiff") deposition in the above-captioned matter.  On April 29, 2014, I re-deposed Plaintiff for approximately one hour before he abruptly terminated the deposition.  An authentic duplicate of the excerpts from Mr. Hartley's deposition cited in Defendant's Motion for Contempt is attached to this Declaration as Exhibit 1.

5.     After the Court's Order on October 11, 2013 granting TNY's first motion to compel, Plaintiff produced over three thousand (3,000) additional pages of documents and over 5 GB of electronically-stored information.

6.     After Plaintiff filed his Second Amended Complaint ("SAC") in the above-captioned matter on September 25, 2013, I conferred with Plaintiff's counsel regarding the need to reopen Plaintiff's deposition to question him about his new claims and the production he made after Plaintiff's initial deposition.  Plaintiff's counsel agreed that TNY was entitled to re-depose Plaintiff and also agreed to make him available for a deposition on December 16, 2013.

7.     On April 25, 2014, Plaintiff produced 76 pages of documents related to his settlement communications with his former counsel.  Those 76 pages consist entirely of e-mail communications between Plaintiff and his former counsel (and attachments thereto).  Authentic duplicates of the portions of Plaintiff's April 25th production (with added pagination for the Court's convenience) are attached to this Declaration as Exhibit 2.

8.     On March 7, 2014, TNY deposed Dena Cannon, a plaintiff in a separate pending lawsuit in this Court, *Eddins, et al. v. Time Warner NY Cable LLC*, No. 1:13-cv-02521-RM-RJW.  An authentic duplicate of the excerpts from Ms. Cannon's deposition cited in Defendant's Motion for Contempt is attached to this Declaration as Exhibit 3.

9.     On April 15, 2014, I e-mailed a copy of the Court's Order granting TNY's second Motion to Compel to Plaintiff.  A true and correct copy of that correspondence (without attachment) is attached to this Declaration as Exhibit 4.

10.     On April 29, 2014, I placed a call to the Court with Plaintiff to attempt to resolve the dispute between the parties regarding Plaintiff's deposition.  The parties were informed during that call that Judge Watanabe was out of the office for the week.

11.     On May 1, 2014, I sent Plaintiff a letter via e-mail in which I specifically informed him that TNY would ask the Court to dismiss his claims against TNY with prejudice due to his failure to comply with the Court's October 11 and April 15 Orders.  A true and correct copy of that correspondence is attached to this Declaration as Exhibit 5.

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 6, 2014, at Atlanta, Georgia.

Nathan D. Chapman

# Exhibit 1

1           UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLORADO

3  Case No. 13-CV-158

4  ------------------------------------------------

5  VIDEO DEPOSITION OF PATRICK G. HARTLEY

6              September 3, 2013

7  ------------------------------------------------

8  PATRICK G. HARTLEY, individually and on behalf of
    others similarly situated,

9

    Plaintiffs,

10

    vs.

11

    TIME WARNER CABLE NY, LLC d/b/a TIME WARNER

12  CABLE, et al.,

13  Defendants.

14  ------------------------------------------------

15  APPEARANCES:

16      THE HARMAN FIRM
           By Walker G. Harman, Jr., Esq.

17              200 West 57th Street, Suite 900
             New York, New York 10019

18               Appearing on behalf of Plaintiffs.

19      WARGO & FRENCH LLP
           By Nathan D. Chapman, Esq.

20              999 Peachtree Street, N.E., 26th Floor
             Atlanta, Georgia 30309

21               Appearing on behalf of Defendants.

22

23      Also Present:  Farid Jabbour

24                  Linda Williams

25                  Nick Borgia, CLVS

1      Q    Have you made a search of that e-mail

2  address for anything related to this case?

3      A    I don't remember.

4      Q    Okay.  And have you made a search of the

5  Hartley13CV158@gmail.com e-mail address for any

6  nonprivileged e-mails related to this litigation?

7      A    Yes.

8      Q    Have you turned those over to Time Warner

9  Cable?

10     A    I don't know.  I provided everything to my

11 attorney.

12     Q    Okay.  You have a Facebook account, right?

13     A    Yes.

14     Q    And do you have multiple Facebook pages?

15     A    Yes, I do.

16     Q    What are those Facebook pages?

17     A    I don't know what their screen names are.

18 I don't know what their web addresses are.  One is

19 associated with Patrickghartley@gmail, and one is

20 associated with Patrickghartley85@gmail.com.

21     Q    Okay.  The primary one that you use on a

22 day-to-day basis, which e-mail address is that

23 associated with?

24     A    85.

25     Q    Okay.  So Patrickghartley85@Gmail.com is the

Page 177

1    one that is associated with the Facebook page that you

2    use day to day?

3         A    Yes.

4         Q    All right.  And you have also created a

5    Facebook page that is dedicated to your fight against

6    Time Warner Cable; is that right?

7         A    No.

8         Q    No.  Okay.

9              Do you have a Facebook page that you have

10   captioned as Your Employer is Not Above the Law?

11        A    Yes.

12        Q    Okay.  What is the purpose of that Facebook

13   page?

14        A    To let people know they have rights under

15   the law.

16        Q    And you are not an attorney, right?

17        A    I am not an attorney.

18        Q    And so people have sent you e-mails at

19   the -- how would you style -- how do you refer to your

20   website or your Facebook site that is dedicated to

21   letting people know their rights?

22             MR. HARMAN:  Objection.

23        A    Can you repeat the question?

24        Q    (BY MR. CHAPMAN)  I just want to know how you

25   refer to that specific Facebook page so I know what to

Page 181

1    Q    What is the Twitter account?

2    A    Pat or it is at Patrick4victims with the

3  number 4.

4    Q    What is the significance of Patrick4victims?

5    A    I am for victims' rights.

6    Q    In what way are you advocating for victims'

7  rights?

8    A    Employees who -- employees who are targeted

9  by their corporations, by their employer.

10   Q    So what are you doing specifically to

11  advocate for them?

12   A    I think it is important to know what the

13  rights are, providing links to the laws themselves.

14   Q    Okay.  So you are not offering legal advice,

15  are you?

16   A    No.

17   Q    And at the outset -- strike that.

18        Have you reviewed -- I know you have not

19  opened up the Patrickghartley85@gmail.com e-mail

20  address, but have you gone through all of the other

21  e-mail addresses to make a review to make sure that all

22  of the information regarding this litigation has been

23  preserved?

24   A    Yes.

25   Q    All right.  You have turned all of that

Page 182

1    information over to your attorneys?

2          A    Yes.

3          Q    All right.  Do you know somebody with an

4    e-mail address of Xkonlegal@hotmail.com?

5          A    Yes.

6          Q    Who is that?

7          A    That is Kurt Pichon.

8          Q    How do you spell that name?

9          A    K-u-r-t P-i-c-h-o-n.

10         Q    Who is Mr. Pichon?

11         A    A friend.

12         Q    All right.  Have you discussed this case

13   with Mr. Pichon?

14         A    Yes.

15         Q    And you have sent and received e-mails from

16   him?

17         A    I don't remember.

18         Q    Okay.  You still have in your possession any

19   e-mails that you would have sent him regarding this

20   case, right?

21         A    Yes.

22         Q    And you still have in your possession any

23   e-mails you would have received from him regarding this

24   case?

25         A    I don't think he has ever responded.

Page 183

1       Q     Did Mr. Pichon ever work at Time Warner

2  Cable?

3       A     No.

4       Q     What is the substance of your communication

5  with Mr. Pichon?

6       A     Keeping him abreast of pleadings and

7  filings.

8       Q     Why are you keeping him abreast of the

9  pleadings and filings?

10      A     He is a friend of mine.

11      Q     Is he a lawyer?

12      A     No.

13      Q     What is the significance of Xkonlegal, if

14  you know?

15      A     I don't know his business.

16      Q     You have exchanged some e-mails with

17  Christopher McKitrick regarding your claims in this

18  litigation, correct?

19      A     I do not remember.

20      Q     Do you have a reason to believe that you

21  haven't exchanged e-mails with him?

22      A     No.

23      Q     And you are aware that there were no e-mails

24  between and you Mr. McKitrick that have been produced,

25  right?

Page 252

1      Q     And there was an attachment to that,

2    correct?

3      A     Yes.

4      Q     And that was the opposition to class

5    certification that we filed in this litigation?

6      A     Yes.

7      Q     And you still have a copy of that e-mail,

8    right?

9      A     Yes.

10           (Exhibit 28 marked.)

11     Q    (BY MR. CHAPMAN)   I am going to hand you what

12   has been marked as Exhibit 28.   I will represent to you

13   this is another set of text messages that was produced

14   to us on Monday of last week.

15           Have you seen this document before?

16     A     Yes.

17     Q     Is this an e-mail exchange between you and

18   Mr. Sergio Alcala?

19     A     Yes.

20     Q     That started on November 11, 2012; is that

21   right?

22     A     Yes.

23     Q     Do you see it at the top there?

24     A     Yes.

25     Q     Is that a screen shot from your cell phone?

Page 253

1      A     Yes.

2      Q     All right.   The blue is?

3      A     Me.

4      Q     The blue bullets on the right side of the

5   document are your statements, right?

6      A     Yes.

7      Q     And the statements on the left side of the

8   document in the white bubbles are Mr. Alcala's

9   statements, right?

10     A     Yes.

11     Q     And he says on November 11, 2012, Hey, at

12  work so can't talk much about you know what.  Thanks for

13  the template you sent.  I have been working on it since

14  this morning.  Give me your e-mail again so I can send

15  it hopefully by tonight.

16            Then you responded with

17  Patrickghartley@gmail.com.

18            Did I read that right?

19     A     Yes.

20     Q     So you and Mr. Alcala exchanged some e-mails

21  regarding a template that you sent him, right?

22     A     Yes.

23     Q     And what was the template that you sent him?

24     A     A sworn statement.

25     Q     So you retained those e-mails, correct?

Page 254

1       A     Yes.   They have been produced to my

2   counsel.

3       Q     All right.   And all of those e-mails came

4   from the Patrickghartley@gmail.com?

5       A     To the best of my knowledge, yes.

6       Q     And you received the e-mails from Mr. Alcala

7   at that address?

8       A     Yes.

9       Q     Okay.   If you will turn, keep going back,

10  there is a Bates label in the bottom right-hand side

11  that says Hartley197.   Let me know when you are at that

12  page.

13      A     I am there.

14      Q     Okay.   This appears percent to be a

15  continuation of text messages and, correct me if I am

16  wrong, but these text messages it says June 15 at 12:56

17  p.m.

18            Does that mean June 15 of 2013?

19      A     Yes.

20      Q     Okay.   So you have one on June 15 at 12:56

21  p.m. and one on June 27 at 3:01 p.m. and one on July 19

22  at 3:24 p.m.

23            Is that what you have on the page that you

24  are looking at?

25      A     Yes.

Page 255

1      Q      All right.  You said, I got your second one.
2  It is perfect.
3             What did you mean by that?
4      A      He sent me a draft of his statement.
5      Q      All right.  And then you responded to him in
6  an e-mail, right?
7      A      Correct.
8      Q      All right.  Then you asked him again, did
9  you get the e-mail?
10     A      Yes.
11     Q      All right.  And then at the bottom you are
12  asking him if he went by another name while he was
13  working at TWC, right?
14     A      Correct.
15     Q      And when he provided you with his EID, what
16  system were you using to look up his name?
17     A      Employee Lookup Tool.
18     Q      And what is the name of that Employee Lookup
19  Tool?
20     A      Employee Lookup Tool.
21     Q      That is the actual proper name?
22     A      Yes.  I think it is Employee Lookup Tool
23  2.0.
24     Q      It allows you to put in somebody's employee
25  ID?

Page 256

1      A      You can search by name, employee ID, sales

2  ID, phone ID, tech number.

3      Q      Okay.  And does that provide you with access

4  to that individual's contact information?

5      A      Not personal, no.

6      Q      Why were you looking up Mr. Alcala's

7  employee ID number?

8      A      Just random curiosity.

9      Q      The e-mails that you referenced on that page

10  of this exhibit, you have preserved those as well,

11  correct?

12      A      I provided everything to counsel.

13      Q      All right.  Do you know if those e-mails

14  specifically have been preserved?

15      A      I don't know.

16      Q      If you look at the previous page, Mr. Alcala

17  says, I am re-sending another version of it because I

18  had forgotten a few more incidents.  I will be setting

19  (sic) more periodically since I am pulling my old notes.

20          Have you ever seen a copy of those notes?

21      A      I have not.

22      Q      You asked Mr. Alcala to put -- strike that.

23          What did you ask Mr. Alcala to put in his

24  declaration?

25      A      His experience.

Page 264

1     Q    Okay.  If you had, you would have turned

2   those over to your lawyers, right?

3     A    Yes.

4     Q    The same thing with e-mails, right?

5     A    Yes.

6     Q    Do you believe that Ms. Laster has any

7   knowledge of your claims in this litigation?

8     A    I don't know.

9     Q    Who is Desiree Bethea?

10    A    A former employee of Time Warner Cable.

11    Q    Have you discussed your claims with her via

12  text messages?

13    A    I don't remember.

14    Q    Have you discussed your claims with her via

15  e-mail?

16    A    I don't remember.

17         (Exhibit 31 marked.)

18    Q   (BY MR. CHAPMAN)  I am going to hand you what

19  has been marked as Exhibit 31.

20         Have you seen that document before?

21    A    Yes.

22    Q    Okay.  And is this a text message exchange

23  between you and Desiree Bethea?

24    A    Yes.

25    Q    Again, your statements are on the right-hand

Page 269

1       A    Yes.

2       Q    Did you ask Ms. Durham for a statement?

3       A    I don't remember.

4       Q    How about Ms. Williams?

5       A    I don't remember.

6       Q    Okay.  But if you have gotten statements

7   from them, you would have preserved those?

8       A    And given them to my attorney.

9       Q    And who is Hazen Garcia?

10      A    I do not even know.

11      Q    Any reason why would you have been texting

12   with someone named Hazen Garcia?

13      A    He sent me a message on Facebook.

14      Q    All right.  You have exchanged texts with

15   Mr. Garcia as well, correct?

16      A    I don't remember.

17      Q    But if you did, you would have turned those

18   over to your attorneys?

19      A    Correct.

20      Q    Same thing with e-mails?

21      A    Correct.

22      Q    Who is Jennifer Staley?

23      A    An employee of Time Warner Cable.

24      Q    Currently?

25      A    I don't know.

Page 271

1      Q    Okay.  Have you exchanged messages with

2   Kevin Koon, correct?

3      A    I don't remember.

4      Q    You have got some statements from Mr. Koon,

5   right?

6      A    Yes.

7      Q    You provided all of all of the e-mails and

8   statements you received from Mr. Koon to your attorneys?

9      A    Yes.

10      Q    And all of the individuals with whom you

11   have exchanged text messages, you have turned over those

12   text messages to your attorneys?

13      A    Yes.

14      Q    You have all of the phone numbers and

15   contact information for those individuals, right?

16      A    I don't know.

17      Q    When you talked about Sharese Washington

18   before.  Have you exchanged any test messages with her

19   regarding your claims?

20      A    I don't remember.

21      Q    And you have turned those over to your

22   attorneys if you have, right?

23      A    Yes.

24      Q    Did you exchange any e-mails with her

25   regarding your claims?

Page 275

1      Q    If you have any e-mails with Ms. Bolden, you

2    would preserve those and have turned them over to your

3    attorneys, correct?

4      A    Yes.

5      Q    All right.  You indicated before that the

6    Hartley13CV158@gmail.com address was created exclusively

7    for attorney communications regarding the case, right?

8      A    I may have misspoken.  Anything sent to

9    that e-mail address has been produced to my attorney.

10              (Exhibit 33 marked.)

11      Q    (BY MR. CHAPMAN)  Okay.  I am going to hand

12    you what has been marked as Exhibit 33.  Again, these

13    are a series of text messages that were produced by your

14    attorneys last week.

15              Do you recognize this as a series of text

16    messages between and you somebody named Jacqueline

17    Jackson?

18      A    Yes.

19      Q    Is Ms. Jackson one of the individuals that

20    you listed in your interrogatory responses as a witness?

21      A    I don't remember.  Let me check.

22      Q    Let me check too because I do not remember.

23    Hold on.  I will withdraw the question so you don't have

24    to look.  It does not appear that she is.

25              So if you exchanged any e-mails with

Page 276

1   Ms. Jackson, you would have searched your accounts and

2   provided those to your attorneys, correct?

3        A    Correct.

4        Q    And you were soliciting Ms. Jackson to join

5   this litigation, correct?

6        A    Yes.

7        Q    If you had exchanged -- strike that.  I

8   already asked you that.

9             Who is Evonna Bijou?

10       A    That is a drag queen out of Pueblo who is a

11  former employee of Time Warner Cable.

12       Q    Okay.  And when you say "drag queen," is

13  that a man or a woman?

14       A    That is a man.

15       Q    Okay.  So did you exchange texts with Evonna

16  Bijou regarding your claims in this litigation?

17       A    I do not remember.

18       Q    But if you, you turned them over to your

19  attorneys.

20       A    Yes.

21       Q    The same with e-mails?

22       A    Yes.

23       Q    Who is Kenneth McFale?

24       A    An employee of Time Warner Cable.

25       Q    Currently?

Page 295

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3    Case No. 13-CV-158

4    ------------------------------------------------

5    VIDEO DEPOSITION OF PATRICK G. HARTLEY VOLUME II

6                                   April 29, 2014

7    ------------------------------------------------

8    PATRICK G. HARTLEY, individually and on behalf of
     others similarly situated,

9

     Plaintiffs,

10

     vs.

11

     TIME WARNER CABLE NY, LLC d/b/a TIME WARNER

12   CABLE, et al.,

13   Defendants.

14   ------------------------------------------------

15   APPEARANCES:

16        PATRICK G. HARTLEY, Pro Se
               3930 Hickory Hill Drive

17             Colorado Springs, Colorado 80906

18        WARGO & FRENCH LLP
               By Nathan D. Chapman, Esq.

19             999 Peachtree Street, N.E., 26th Floor
               Atlanta, Georgia 30309

20             Appearing on behalf of Defendants.

21        Also Present: Joel Coriat, CLVS

22

23

24

25   Job No. CS1844974

Page 302

1      A     I object to the question to the extent that

2  the answer may reveal work product privilege.

3      Q     You have no work product privilege, sir, and

4  that is not a valid objection.  It is also not valid for

5  you to make objections because you are not represented

6  by counsel.

7            Do you understand that?

8      A     I understand what you are saying, but I do

9  not agree with that.

10     Q     Well, I move to strike.  Did you --

11     A     Objection.

12     Q     What filings did you review other than the

13  filings that you have described to me today?

14     A     All of the discovery that I have in my

15  possession.

16     Q     And why did you do that?

17     A     In order to prepare for the deposition.

18     Q     Okay.

19            Did you speak with anyone in preparation for

20  your deposition?

21     A     No.

22     Q     You have exchanged electronic communications

23  with Dena Cannon about this case since we took your

24  deposition last September, correct?

25     A     Yes.

Page 303

1        Q     And you have not produced those, correct?

2        A     Those will be responsive by the discovery

3   deadline.

4        Q     You have exchanged electronic communications

5   with other individuals since we took your deposition

6   last, correct?

7        A     Yes.

8        Q     And you have not provided those to us,

9   correct?

10       A     I didn't.  Those will be responsive by the

11  discovery deadline.

12       Q     And we will ask you to supplement those

13  prior to the discovery deadline.

14             Who have you communicated with regarding

15  this case since your deposition last September?

16       A     Let us see.  I sent the Facebook message to

17  Dena Cannon regarding the status of the most recent

18  hearing on February 11.

19       Q     Sir, I just asked you who.

20       A     Dena Cannon, Juli Van Tuli, Susan Bolden,

21  Jerry Evans, Stephanie Evans.  I don't remember the

22  rest of them off the top of my head.

23       Q     You communicated with them in writing?

24       A     Yes.

25       Q     About this case?

Page 324

1    to Time Warner Cable on Friday the 13th of December; is

2    that right?

3         A     That's correct.

4         Q     And you thanked them for their hard work,

5    right?

6         A     Yes, I did.

7         Q     And Mr. Moss advised you that Time Warner

8    Cable was planning to file the contempt motion, right?

9         A     Yes.

10        Q     Did you believe he was being truthful with

11   you there when he advised you of that?

12        A     Yes.

13        Q     And did you have some discussions with him

14   after you exchanged these e-mails about a payment plan

15   of the $2,500 you owed to Time Warner Cable?

16        A     Yes.

17        Q     All right.

18              And so understood that you were obligated to

19   pay that money, right?

20        A     There is a pending motion to reconsider.

21        Q     I move to strike as nonresponsive.

22              At the time you had the discussions with

23   Mr. Moss about a payment plan, you understood that you

24   were obligated to pay that money, correct?

25        A     Again, we were discussing options if we

Page 325

1   needed to move forward after the motion for

2   reconsideration had been ordered by the court.

3         Q     So notwithstanding the fact that you had a

4   court order ordering you to pay the money, you did not

5   believe you were obligated to pay that money yet?

6         A     Correct, based on the information my

7   attorneys had told me because there is a pending

8   motion.

9         Q     Your attorneys advised you that you did not

10  have to pay the $2,500 fee award because there was a

11  pending motion for reconsideration?

12        A     Correct.

13        Q     When did they tell that you?

14        A     In a phone conversation around the first

15  week in December.

16        Q     So you remember that phone conversation?

17        A     I do remember it because it was very close

18  to when this e-mail came through.

19        Q     Who told you that specifically?

20        A     I believe it was Brian Moss.

21        Q     He told you specifically that you were under

22  no obligation to pay the $2,500 fee award because they

23  had move for reconsideration?

24        A     Correct.

25              (Exhibit 52 marked.)

Page 326

1    Q    (BY MR. CHAPMAN)  Mr. Hartley, you have been

2    handed what has been marked as Exhibit 52.

3              Have you seen that document before?

4    A    I have but there is a blank line through

5    the middle.  I am not sure what it says underneath

6    there.

7    Q    Yes.  That is the form in which you produced

8    these documents.

9              So I was going to ask you why that was

10   redacted?

11   A    I did not cross anything out on the emails

12   when I sent them to you.

13   Q    Well, there is a black smudge across the

14   December 5, 2013 e-mail at 6:27 a.m.

15   A    That is Walker Harman's written explanation

16   of the proposed settlement offer.

17   Q    Why was that deleted from your e-mail?

18   A    I don't know.  I didn't do that.

19   Q    But you printed these e-mails off and sent

20   them to us, right?

21   A    Yes.

22   Q    And it is your testimony that when you

23   viewed this e-mail on your computer screen, it appears

24   with black markings on?

25   A    It is not my testimony.  The black markings

Page 327

1    were there.

2         Q    How did the black markings get there?

3         A    I don't know.

4         Q    Has anybody else been in custody and control

5    of the e-mail but you since you printed it off?

6         A    No.

7         Q    You cannot offer me an explanation as to why

8    this section is blacked out?

9         A    I am happy to go home and e-mail you this

10   exact e-mail, but it is the same sentence that

11   Mr. Harman, that I put in my response, either 126 or

12   127, depending on which one you look at, docket entry.

13   It is the response that Mr. Harman gave me which was

14   the first written explanation of your settlement offer

15   which did not include any reference to any

16   non-disparagement, nondisclosure confidentiality.

17        Q    This is an authentic copy notwithstanding

18   the black markings on the December 5, 2013 e-mail, this

19   is an authentic copy of the e-mail exchange that you had

20   with Mr. Harman and Mr. Moss on December 5 and 4, 2013?

21        A    Correct.

22        Q    And you were discussing an agreement with

23   Mr. Harman that the costs of your case would be rolled

24   into the Ettins case, right?

25        A    Yes.

Page 328

1      Q    And was that something that he proposed?

2      A    Yes.

3      Q    And Mr. Harman told you that if you settled

4  upon the terms that Time Warner Cable was offering, that

5  he would agree to roll your costs into the Ettins case?

6      A    Yes.

7      Q    And if you look at the second page of that

8  e-mail, the December 5, 2013 e-mail at 3:03 p.m.,

9  Mr. Moss writes you and indicates that he texted you; is

10  that correct?

11      A    That is what he said, yes.

12      Q    And you were, in fact, exchanging text

13  messages with Mr. Moss and Mr. Harman throughout this

14  period, correct?

15      A    I do not remember.

16      Q    Have you exchanged text messages with

17  Mr. Moss or Mr. Harman regarding settlement?

18      A    I don't remember.

19      Q    Okay.  And you have not made any effort to

20  look for text messages related to settlement, have you?

21      A    I don't believe we ever talked about

22  settlement options over text messages.

23      Q    But you have not made a review of your files

24  and your text messages to confirm that, have you?

25      A    Again, the Harman Firm should have that

Page 329

1    information.

2         Q    I move to strike as nonresponsive.

3              Have you or have you not looked for text

4    messages to see if there is any discussing settlement?

5         A    I have not because I have no reason to

6    believe they are in there.

7         Q    I move to strike everything after because.

8         A    Objection.

9              (Exhibit 53 marked.)

10        Q    (BY MR. CHAPMAN)   Mr. Hartley, you have been

11   handed what has been marked as Exhibit 53.

12             Have you seen that document before?

13        A    Yes.

14        Q    Is that a true and correct copy of an e-mail

15   exchange between you and Mr. Moss and Mr. Harman on

16   December 9, 2013?

17        A    Yes, this was my counteroffer.

18        Q    And in your first e-mail at 9:33 a.m. you

19   wrote that you accept their offer under three

20   conditions; is that right?

21        A    Yes.

22        Q    The first was that your costs to the Harman

23   Firm get rolled into Ettins, is that right?

24        A    Yes.

25        Q    And so you wanted to have the Ettins

Page 358

1      A      Depending on how the representatives were

2  planning on presenting the information.

3      Q      What if you didn't have any representatives

4  to present the information?

5      A      Then I would be the one responsible and I

6  would represent it differently then they intended to

7  represent it.

8           Mr. Chapman, have you read the pretrial

9  order that the court ordered in this case?

10     Q      I move to strike as nonresponsive.  You

11  cannot ask me questions, sir.

12     A      I am calling this deposition.  We have now

13  reached the seven hours per deponent as ordered by the

14  court.

15     Q      Sir, we have actually not and you do not

16  have any basis for saying that.

17     A      Okay.  Well, I am disputing that.

18     Q      Okay.

19     A      I am not going to continue this deposition.

20     Q      The other point you should be aware of, sir,

21  is that the judge specifically ordered that you would be

22  deposed again on your new claims after the motion to

23  amend the complaint was decided.

24     A      Then I think we need to get the judge on

25  the line.

Page 359

1      Q      Then I think we do.

2             Before we go off the record, what basis do

3      you have to say that we have been on the record for

4      seven hours?

5      A      Well, in my last deposition we were on the

6      record from 10:10 to 10:54, which is 44 minutes.  We

7      were on the record from 11 to 11:34, which is 34

8      minutes.  We were on the record from 11:41 to 12:16,

9      which is 35 minutes.  We were on the record from 12:26

10     to 1:22, which is 56 minutes.  We were on the record

11     again from 2:12 to 3:17, which is 65 minutes.  We were

12     again on the record from 3:27 to 4:18, which is 51

13     minutes.  We were again on the record from 4:26 to

14     5:20, which is 54 minutes.  And then again on the

15     record from 5:28 to 5:37 p.m., which is nine minutes, a

16     total of 348 minutes, which is 5.8 hours.  This

17     deposition has gone on for one hour, over one hour and

18     12 minutes, which would be the seven hours which the

19     court in his handwriting limits depositions to seven

20     hours per deponent.

21     Q      Right.  And you also read the court's order

22     instructing you specifically that if your complaint was

23     amended, you would come back and sit for a separate

24     deposition on the new claims, right?

25     A      The amended complaint was already filed

Page 360

1    previous to the last deposition.

2              MR. CHAPMAN:  There was no decision on that

3    and you know.  It.  Go off the record, please.  Thank

4    you.

5              THE VIDEOGRAPHER:  Off the record at 1:11.

6              (Recess was taken.)

7              THE VIDEOGRAPHER:  We are back on the record

8    at 1:11.

9              MR. CHAPMAN:  Mr. Hartley, I will advise you

10   right now that if we are forced to go to motion practice

11   on this, we will be seeking attorney's fees and costs

12   associated with your conduct.

13             Off the record.  Thank you.

14             THE VIDEOGRAPHER:  Off the record at 1:11.

15             (Recess was taken.)

16             THE VIDEOGRAPHER:  Back on the record at

17   1:14.

18        Q    Mr. Hartley, are you still refusing to

19   answer additional questions in this deposition?

20        A    Until I hear from an order from the court,

21   yes.

22             MR. CHAPMAN:  Okay.  Let us go off the

23   record.

24             THE VIDEOGRAPHER:  Off the record at --

25             MR. CHAPMAN:  Actually, go back on real

# Exhibit 2



# Call

**Patrick Hartley** <patrickghartley@gmail.com>                Wed, Dec 4, 2013 at 6:06 PM
To: Brian Moss <bmoss@theharmanfirm.com>, W Harman <wharman@theharmanfirm.com>, Lucas Larson
<llarson@theharmanfirm.com>

Lucas,

Can you please schedule a call for me, brian, and walker on December 5, 2013?

Thanks

**Walker G. Harman, Jr.** <wharman@theharmanfirm.com>          Thu, Dec 5, 2013 at 6:27 AM
To: Patrick Hartley <patrickghartley@gmail.com>
Cc: Brian Moss <bmoss@theharmanfirm.com>, Lucas Larson <llarson@theharmanfirm.com>



Walker G. Harman, Jr.
ttorney at Law
The Harman Firm, PC
200 West 57th Street | Suite 900 | New York NY 10019
t            | d            | f

This message and any attached file are intended only for the person or entity to which they are addressed and may
contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution,
or copying of this message or the information herein by anyone other than the intended recipient, or an agent thereof,
is prohibited. If you have received this message in error, please notify us immediately.
[Quoted text hidden]

**Patrick Hartley** <patrickghartley@gmail.com>               Thu, Dec 5, 2013 at 7:34 AM
To: "Walker G. Harman, Jr." <wharman@theharmanfirm.com>
Cc: Brian Moss <bmoss@theharmanfirm.com>, Lucas Larson <llarson@theharmanfirm.com>

And my costs associated with my case are then rolled over to eddins?

[Quoted text hidden]

**Patrick Hartley** <patrickghartley@gmail.com>               Thu, Dec 5, 2013 at 2:58 PM
To: "Walker G. Harman, Jr." <wharman@theharmanfirm.com>
Cc: Brian Moss <bmoss@theharmanfirm.com>, Lucas Larson <llarson@theharmanfirm.com>

Hi.

Gmail -- Call                                                                      1/16/14, 11:47 PM

Just checking in. Anything new with the settlement situation?  Thanks!

[Quoted text hidden]

**Brian Moss** <bmoss@theharmanfirm.com>                    Thu, Dec 5, 2013 at 3:03 PM
To: Patrick Hartley <patrickghartley@gmail.com>
Cc: "Walker G. Harman, Jr." <wharman@theharmanfirm.com>, Lucas Larson <llarson@theharmanfirm.com>

Hi Patrick,

I texted you.  Walker can talk with you tomorrow morning.  Thx.

Brian

Brian M. Moss
Attorney at Law
THE HARMAN FIRM, PC
200 West 57th Street | Suite 900 | New York NY 10019
t                            | f


This message and any attached file are intended only for the person or entity to which they are addressed, and may contain information that
is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, or copying of this message or the information
herein by anyone other than the intended recipient, or an agent thereof, is prohibited. If you have received this message in error, please
notify us immediately.
[Quoted text hidden]

**rick Hartley** <patrickghartley@gmail.com>                 Thu, Dec 5, 2013 at 3:04 PM
To: Brian Moss <bmoss@theharmanfirm.com>
Cc: Lucas Larson <llarson@theharmanfirm.com>, "Walker G. Harman, Jr." <wharman@theharmanfirm.com>

Ok. I didnt get a text, sorry. Talk to you tomorrow!

[Quoted text hidden]

Exhibit 2: 17 of 76

2/2/14, 9:34 PM

This message and any attached file are intended only for the person or entity to which they are addressed, and may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, or copying of this message or the information herein by anyone other than the intended recipient, or an agent thereof, is prohibited. If you have received this message in error, please notify us immediately.
[Quoted text hidden]

---

**Patrick Hartley** <patrickghartley@gmail.com>                    Thu, Jan 23, 2014 at 7:51 AM
To: "Walker G. Harman, Jr." <wharman@theharmanfirm.com>
Cc: Brian Moss <bmoss@theharmanfirm.com>, Lucas Larson <llarson@theharmanfirm.com>

Gentlemen,

~~This makes the second time you have threatened to abandon my case.~~ From the onset of litigation I have expressed my objection to any limitation on my right to speak about these matters.   Other victims of TWC may also have claims, as evidenced by more witnesses continuing to come forward.  The Defendant still have not produced discovery, yet the evidence supporting a class claim of TWC's pretext discrimination toward protected employees keeps mounting.

In your previous email you said that you have explained the "procedural posture and strengths and weaknesses of your case."  I'm sorry to say that I don't believe that you have fully advised me on all those matters, including all other legal options available to me.  We had a conversation on the phone that I did not understand, and have asked repeatedly for an explanation in writing.  As of this message, I have still not received written explanations.

Additionally, I have requested from your office that my deposition transcripts, copies of filings and court orders be emailed to me on more than one occasion, but have not received any of these documents.

I am happy to hear that you have now responded to Ms. LeMaster, but as discovery is now closed, and because of the Notice of Settlement filed with the court, the defendants did not answer discovery, and it seems like it's almost a pointless exercise now.

You also said in your previous email that, "as we have asked you before, provide us with a list of people whom you want to be bound by confidentiality and non-disparagement, and we will add their names to the agreement."

As I have informed you before, the list of names is unworkable.  The defendant has no legal authority to bind third parties from speaking on these matters. Furthermore, there is no penalty in this agreement if any of the defendants signatories were to break it's terms.

You further stated in your email that this was the best deal you could arrange based on the discovery you had available at the time.  As no additional discovery, including deposition of the principles, was completed, we have no way of knowing what the best deal could have been.

According to the fee agreement we completed, you were to "report the status of any settlement negotiations to (me) and will not conclude a settlement on (my) behalf without (my) knowledge or consent." It appears from a plain reading of the Notice of Settlement in Principle, which I discovered when checking the court docket on my own, that some agreement was made.  I have not, in the past or in the present, agreed to these terms, neither in writing, in person, or on the phone.

I went so far as to offer a more than reasonable counter to the settlement, prior to defendants response to discovery, as long as I wasn't bound to silence.  Even so, that was refused.

~~Please advise in writing how this settlement came about and why the defendants filed notice of settlement with the court before the agreement had even been reduced to writing, without my input or consent.~~

Patrick G. Hartley
3930 Hickory Hill Drive
Colorado Springs, CO 80906
719-200-8241

# Exhibit 3

Page 1

1

2  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF COLORADO
3  Case No. 13-cv-02521-RM-MJW

4  _____

   VIDEO DEPOSITION OF DENA MARLENE CANNON
5  March 7, 2014

6  _____

7  JERRY W. EDDINS, DENA M. CANNON, SHRISICE
   WASHINGTON, DIONNE MACKEY, STEPHANIE S. A. EDDINS,
8  MICHAEL BYCZEK, TERI NELSON, JULIANA VAN TUIL, KATIE
   YOUNG, and SUZANNE BOLDEN on behalf of themselves
9  and other similarly situated,

10 Plaintiffs,

11 vs.

12 TIME WARNER NY CABLE LLC,

13 Defendant.

   _____

14

   APPEARANCES:

15

      CORNISH & DELL'OLIO, P.C.
16         By Bradley J. Sherman, Esq.
            431 North Cascade Avenue, Suite 1
17         Colorado Springs, Colorado  80903
               Appearing on behalf of Plaintiffs.

18

      WARGO & FRENCH LLP
19         By Joseph W. Ozmer II, Esq.
            and
20          Anthony E. Giardino, Esq.
           999 Peachtree Street, NE
21         26th Floor
           Atlanta, Georgia  30309
22             Appearing on behalf of Defendant.

23    Also present: Farid Jabhour
                   Roger Stuart, CLVS

24

25    Job No. CS1815243

Page 19

```
1      A    Well, I -- I did call Chad right before I
2   got here because I did not want to get in trouble
3   for not being here at 9 so -- but that was the only
4   part of that conversation.  He said that he would
5   take care of it.  And he did tell me that that --
6   it -- he told me 10 o'clock.  So that -- we had that
7   very brief conversation this morning.  Other than
8   that, I've spoken to Brian Moss and then Walker
9   Harman on the days that I stated.
10      Q    Okay.  Have you talked to any of the other
11   plaintiffs in the case?
12      A    I have not recently but, I mean, I have
13   talked with some, yes.
14      Q    When's the -- when's the last time you
15   talked to Patrick Hartley?
16      A    Oh, I -- are you referencing in --
17   verbally or in any way?
18      Q    When's the last time you communicated with
19   him?
20      A    Okay.  I did communicate with him early,
21   early this morning.  He had told me that something
22   had happened with him.  But, I mean, that was
23   just -- it was very quick, short little, you know,
24   post about his part of his case.  That was the last
25   time I talked to him.
```

Page 20

1    Q    What did he tell you?

2    A    He told me that he had, I guess, made a

3  complaint to the courts about Walker Harman.  And he

4  had stated that there was a problem with settlement

5  offers and that he didn't give his express

6  permission for it, and so he filed a complaint.

7    Q    And was this -- was this via e-mail?

8  Facebook post?  What was that?

9    A    No.  That was Facebook.

10   Q    Okay.

11   A    That was through messages on Facebook.

12   Q    And we're going to ask you to preserve

13  that because we're -- we're -- we're entitled to

14  that commnication --

15   A    That's fine.

16   Q    -- and we want to get that.

17        So he told you for -- that he'd had a

18  falling out with -- with Mr. Harman and his firm?

19   A    Yes.

20   Q    Okay.  And was he telling you this in

21  conjunction with your -- with your own dep --

22  deposition?

23   A    No, he wasn't.

24   Q    Do you know why -- what -- why the timing

25  of it was this morning?

Page 21

1      A     Well, it wasn't -- the post wasn't sent

2   solely to me.  It was sent as a group message.  So

3   it included at least six or seven different people.

4   So it was not just me that he sent it to.

5      Q     Okay.

6      A     It was also -- my husband's name was

7   included and a few other names I didn't recognize

8   off the bat.  I would assume they're his other

9   friends.

10     Q     Did he -- was Suzanne Bolden one of the

11  people he sent it to?

12     A     I wasn't able to see if her name was on

13  there or not.  It actually cuts off.  At about two

14  or three names in it'll cut off and say four -- four

15  other individuals.

16     Q     Okay.  Juliana van Tuil, was she on there?

17     A     (Indicating.)

18     Q     Do you know her?

19     A     I recognize the name --

20     Q     Okay.

21     A     -- yes, as being on the case.  I don't

22  know her personally, though.

23     Q     And I asked you about Suzanne Bolden.  Do

24  you know her personally?

25     A     I do not.

Page 22

1      Q    Okay.

2      A    I -- I know her name, but I do not know

3  her personally.

4      Q    How -- how long was this post?  Several

5  paragraphs?

6      A    No. No.  No.  It was probably about --

7  maybe four -- I think he did two and I did two.  I

8  just asked him what was -- why, what had happened.

9  He told me.  And I said I'm sorry, you know, that

10  that happened.  And, you know, it just was about --

11  yeah, about four, maybe five posts.  That was about

12  it.

13     Q    Okay.  So you responded to him?

14     A    Um-hum.

15     Q    So you all --

16          THE COURT REPORTER:  Yes?

17     Q    (By Mr. Ozmer) -- had a conversation --

18          THE COURT REPORTER:  Yes?

19     A    Yes.

20     Q    (By Mr. Ozmer) You had a conversation back

21  and forth?

22     A    Sorry.  Yes.  A brief one.

23     Q    Did you tell him you were being deposed

24  today?

25     A    No.  I don't think so.

Page 23

1      Q     Did he tell -- so he -- he did tell you

2   that he'd filed a formal complaint --

3      A     Um-hum.

4      Q     -- against --

5      A     Yes.

6      Q     -- Mr. Harman and Mr. Moss?

7      A     Yes.

8      Q     All right.  And Hartley was the one --

9   and -- and Mr. Harman and Mr. Moss are the lead

10   counsel in -- in your case, the case that you're

11   here for today as well, right?

12      A     Yes.

13      Q     And Mr. Hartley found those attorneys for

14   you and for the other plaintiffs, found Mr. Harman

15   and Mr. Moss?

16      A     I don't know if it was Patrick Hartley

17   that did it.

18      Q     Okay.

19      A     I was under the impression that it was the

20   first name on the list, the Eddins.

21      Q     Um-hum.

22      A     But I know that Patrick Hartley had

23   started the -- his portion of it because I know his

24   portion of it is separate.

25      Q     He has his own case, right?

Page 25

1     A     This particular one, no.  I've never seen

2   it like this, no.

3     Q     Okay.  Have you seen some form of a -- of

4   a written complaint like this that Hartley had

5   against Mr. Harman and Mr. Moss, the Harman firm?

6     A     Not for Patrick Hartley, no.

7     Q     What are you referring to?  You seem to be

8   referring to something that is similar to this.

9   What are you referring to?

10     A     The paperwork that was sent to me --

11     Q     Um-hum.

12     A     -- by Walker, which had this -- it -- it

13   was a different -- it's -- wasn't like this.  It

14   was about 27 pages long.  It was just the

15   interrogatories.

16     Q     Okay.

17     A     And I -- I've -- I've never seen anything

18   like this.

19     Q     Okay.

20     A     He's never sent me anything like this.

21     Q     Okay.  Was this morning the first time

22   that you heard that Patrick Hartley was having

23   problems with the Harman firm?

24     A     Correct.  I haven't heard from him

25   previously about this.

Page 26

1       Q       So did -- in the -- the communications you

2  had with Mr. Hartley this morning, did he tell you

3  that he was accusing the Harman firm of failing to

4  keep him informed?

5       A       Correct.

6       Q       He did tell you that?

7       A       Yes.

8       Q       All right.

9       A       Through the -- the -- the post.

10      Q       And did he tell you that he was accusing

11  them of trying to intimidate him?

12      A       No.   That was not part of the post.

13      Q       Did he tell you that he was accusing the

14  Harman firm in his complaint of misrepresenting the

15  law?

16      A       I don't know what that would mean.   Can

17  you...

18      Q       Well, did he -- did he say that -- that

19  the Harman firm had misrepresented the -- the -- the

20  law to him in any way?

21      A       I -- I don't know if it would be

22  misrepresenting the law.   I know that the specific

23  thing that he said was that they -- he had made a

24  settlement offer that was not approved by him.   I

25  don't know if that would fall under that or not.

1    Q    And was it before or after the case that

2   you're involved in was filed?

3    A    No.  It was during the -- during the

4   filing of it.

5    Q    Of your case?

6    A    Yes --

7    Q    Okay.

8    A    -- of -- of mine, because I gave him my

9   documents.

10    Q    Okay.  It was while the -- the com -- do

11   you understand when I say complaint, the former

12   (sic) legal -- the formal legal complaint is what

13   starts a lawsuit, do you understand that, that you

14   file in court?

15    A    I -- I do understand that.  I just -- I

16   don't know, you know, what the name of the documents

17   were that I had.

18    Q    Okay.  And I'm not asking you that.  But I

19   just want -- want to -- you do understand that the

20   way that a lawsuit starts is that the plaintiff --

21    A    Um-hum.

22    Q    -- or plaintiffs, in your case, they file

23   what's called a complaint with the court?

24    A    Right.

25    Q    You understand?

Page 32

1      A      Yes.

2      Q      So I just wanted to make sure we under --

3  we're on the same sheet of music there --

4      A      Okay.

5      Q      -- because what I want to ask you is, if

6  I'm hearing you correctly, the documents that you

7  filled out to him that had a -- you know, like

8  numbered 1 to 15 or something --

9      A      Um-hum.

10     Q      -- are you saying that that was in the

11  process of -- of putting together the -- the

12  complaint for your case?

13     A      Yes.

14     Q      Okay.

15     A      That's it.

16     Q      All right.

17          MR. OZMER:  Counsel, those -- we're going

18  to want those documents.  Obviously with -- with

19  Mr. Hartley involved, they're not going to be

20  privileged and -- or -- and any work product would

21  be waived.  But we certainly don't have those

22  documents and -- and we're entitled to them.  And I

23  suspect you don't have them either, but you're the

24  one sitting here so...

25          MR. SHERMAN:  Understood.  I'll pass it

# Exhibit 4

**Sherman, Paul**

| | |
|---|---|
| **From:** | Chapman, Nathan |
| **Sent:** | Tuesday, April 15, 2014 4:22 PM |
| **To:** | patrickghartley@gmail.com |
| **Cc:** | Sherman, Paul; Josh A. Marks (jam@bhgrlaw.com); Westenberger, Bonnie P. |
| **Subject:** | TNY/Hartley - Order on Motion to Compel |
| **Attachments:** | Hartley - Order on Motion to Compel.pdf |

Mr. Hartley:

The court has ordered you to produce all settlement communications with the Harman Firm, P.C., by no later than April 25, 2014.  Pursuant to the Court's scheduling order, all such communications should be produced in PDF form.  We do not use Apple products or services at our firm, so please ensure that the documents are in PDF form.   The documents should be delivered to our offices at the address below on a disc or thumb drive by the deadline set by the Court.

Please let us know if you have any questions.

Regards,

Nathan D. Chapman
**Wargo French**
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1535
Facsimile: (404) 853-1536
Email: nchapman@wargofrench.com
Website: www.wargofrench.com



# Exhibit 5



**WARGO FRENCH**

ATLANTA   LOS ANGELES   MIAMI

NATHAN D. CHAPMAN<br>
DIRECT DIAL: 404.853.1535<br>
E-MAIL: <i>nchapman@wargofrench.com</i>

May 1, 2014

<u>**VIA E-MAIL AND U.S. MAIL**</u>

Patrick Hartley
3930 Hickory Hill Drive
Colorado Springs, CO 80906

      Re:   <u>Patrick Hartley v. Time Warner NY Cable LLC,</u>
               U.S.D.C. for the District of Colorado,
               Civil Action No. 1:13-cv-00158-RM-MJW

Dear Mr. Hartley:

      This letter concerns your contempt of the Court's orders of October 11, 2013, and April 15, 2014, as well as your improper termination of your deposition on April 29, 2014.

                <u>**Your Contempt of the Court's October 11, 2013 Order**</u>

      As you know, on August 13, 2013, the Court held a hearing regarding Defendant's motion to compel discovery against you. During that hearing, the Court stated that it would "reopen" discovery and allow TNY to depose you again in the event that you were ordered to produce additional documents. On October 11, 2013, the Court granted TNY's motion to compel, in part, holding that you had not properly responded to discovery, imposing sanctions for your failure, and ordering you to produce additional documents. Such documents included e-mail and social media communications between you and third parties regarding your claims in this litigation.

      At your deposition on April 29, 2014, you admitted that you are in possession of various communications that are clearly fall within the categories of documents the Court ordered you to produce. For example, you testified that you possess e-mail and social media communications with Dena Cannon and other individuals regarding this litigation, yet you have not produced those documents. Indeed, you stated that you intended to produce these documents only on the last day of discovery. Obviously, your intent was to ensure that we would not have the benefit of such documents in preparing for and taking your deposition. In any event, regardless of your intent, you have willfully violated the Court's order.

Accordingly, please produce all documents responsive to Defendant's discovery requests no later than 5:00 p.m. on May 2. If you fail to do so, TNY will move the Court for an order finding you in contempt. TNY will seek its fees and costs associated with preparing that motion.

### Your Contempt of the Court's April 15, 2014 Order

Before you improperly terminated your deposition on April 29, 2014, your testimony established that you have failed to comply with the Court's April 15 order requiring you to produce to TNY all "settlement communications" between you and your former counsel. Specifically, despite the fact that the e-mails you produced reference text messages between you and your former counsel that related to the settlement, you admitted that you did not search for or produce any of those responsive text messages to TNY. Please produce those text messages by no later than 5:00 p.m. EST this Friday, May 2, 2014. If you fail to do so, TNY will move the Court for an order finding you in contempt and ordering you to compel the production of those text messages. TNY will seek its fees and costs associated with preparing that motion.

### Your Improper Termination of Your Deposition on April 29, 2014

On April 29, 2014, you prematurely terminated your deposition, claiming that TNY was not entitled to depose you for more than seven (7) hours despite the fact that you amended your complaint to add additional claims and produced over three thousand additional pages of documents and over 5 GB of electronically stored information related to those claims *after* your initial deposition on September 3, 2013. Your conduct was a transparent, bad faith attempt to prevent TNY from deposing you as to the settlement issues, as well as the new claims you have asserted and new documents you have produced since your September 3 deposition.

Notably, during the motion to compel hearing held on August 13, 2013, the Court stated that TNY would be entitled to re-convene your deposition if the Court ordered you to produce additional documents. As noted above, the Court so ordered on October 11, 2013. Moreover, since the date your deposition was initially convened (September 3), you have asserted several additional claims in this action. Given these circumstances, the parties agreed that you would appear for deposition on December 16, 2013, to allow TNY to take discovery on your new claims and documents. Indeed, as a matter of law, TNY is entitled to a fair opportunity to fully depose you regarding those subsequently-produced documents and your new claims. *See Archer Daniels Midland Co. v. Hartford Fire Ins. Co.*, 243 F.3d 369, 374-75 (7th Cir. 2001) (concluding that had trial court allowed plaintiff to amend complaint to allege fraud, it would have been necessary to reopen discovery and take depositions of persons already deposed); *Christy v. Pennsylvania Turnpike Com'n*, 160 F.R.D. 49, 51 (E.D. Pa. 1995) (second deposition based on new parties and new allegations); *Morrison v. Stephenson*, 2008 WL 145017 (S.D. Ohio Jan. 10, 2008) (stating that "new information comes to light ..., [when] new parties are added to the case, new allegations are made in pleadings, or new documents are produced, . . .").

Despite the clear record and previous agreements of the parties, you appeared at your deposition with the clear intention of terminating it at what you believe to be the seven-hour

mark. Remarkably, however, you made no effort to notify TNY or confer regarding that matter so that we could, if necessary, obtain an order from the Court. Instead, you waited until the middle of your deposition to refuse to answer any more of TNY's questions and read a prepared statement of time spent on the record. Your unilateral attempt to short circuit the deposition was in bad faith, especially in light of the impending hearing on TNY's Motion to Enforce the Settlement between the parties.

Given your bad faith conduct, as well as your stated refusal to answer any more questions without a court order, TNY will move to reopen your deposition, seek a continuance of the evidentiary hearing (if necessary), and will request that the Court sanction you (again) for your misconduct. Based on your pattern and practice of inhibiting this litigation, we will be asking that the court dismiss your claims with prejudice and award TNY its attorneys' fees and costs.

### Your Continued Failure to Comply With Discovery Obligations

Finally, you have never supplemented your discovery responses despite amending the complaint to add new claims. For example, Interrogatory No. 2 requires you to state the total amount of damages you are seeking in this case. Interrogatory No. 3 asks for the identity of all persons believed by you to knowledge of the claims asserted in your complaint. Interrogatory No. 6 asks for the identity of all individuals with whom you have communicated regarding the allegations in the complaint. Interrogatory No. 14 asks for you to identify all "compensation, pay raises, promotions or any other benefit or opportunity for advancement that TNY denied to you upon which you are relying for the claims asserted in the Complaint." Interrogatory No. 18 asks you to identify and describe all communications you have had that support, refute or relate to the claims asserted in your complaint, and all witnesses to each communication.

Presumably, your answers to these interrogatories, which were served before you amended your complaint, would need to be updated based on the new claims after the amendment. As such, please supplement your responses to these interrogatories by no later than 5:00 p.m. EST this Friday, May 2, 2014, or confirm in writing that your previous responses to these interrogatories are complete.

You should consider this letter our good faith attempt to confer with you pursuant to Rule 37 of the Federal Rules of Civil Procedure and Local Civil Rule 7.1(a) regarding the contempt and discovery issues described above. This letter further confirms your unwillingness to speak with us by telephone, thus necessitating conferral solely through correspondence.

Sincerely,

Nathan D. Chapman